# In the United States Court of Federal Claims

No. 21-1067C

(E-Filed:  March 22, 2022)[1]

|  |  |  |
|---|---|---|
| TRILOGY FEDERAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | Post-Award Bid Protest; Motion for |
| | ) | Judgment on the Administrative Record; |
| Defendant, | ) | RCFC 52.1; Standing; Prejudice. |
| | ) | |
| and | ) | |
| | ) | |
| APTIVE RESOURCES, LLC, | ) | |
| | ) | |
| Intervenor-defendant. | ) | |
| | ) | |

Kelsey M. Hayes, Tysons, VA, for plaintiff.  Terry L. Elling and Hillary J. Freund, of counsel.

Sonia W. Murphy, Trial Attorney, with whom were Brian M. Boynton, Acting Assistant Attorney General, Martin F. Hockey, Jr., Acting Director, and Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Frank V. DiNicola, Desiree A. DiCorcia, Tara T. Nash, and Tobias Hunziker, Eatontown, NJ, United States Department of Veterans Affairs, of counsel.

John R. Prairie, Washington, DC, for intervenor-defendant.  Cara L. Lasley and Jennifer Eve Retener, of counsel.

---

[1]    This opinion was originally issued under seal on March 1, 2022.  See ECF No. 65.  The parties were invited to identify all competition-sensitive information subject to deletion on the basis that the material is protected and privileged.  No redactions were proposed by the parties. See ECF No. 67 (joint status report).  Thus, the sealed and public versions of this opinion are identical, except for the publication date and this footnote.

<u>OPINION</u>

CAMPBELL-SMITH, Judge.

Plaintiff filed this bid protest challenging the Department of Veterans Affairs' (VA) decision to exclude plaintiff from the competitive range in a procurement for information technology (IT) services.  <u>See</u> ECF No. 1 (complaint).  Plaintiff filed a motion for judgment on the administrative record (AR) in this case, ECF No. 34; and defendant and intervenor-defendant each filed cross-motions for judgment on the AR, ECF No. 36; ECF No. 44.  After the initial briefing was complete, the court ordered the parties to submit supplemental briefs on the issue of standing, <u>see</u> ECF No. 60, and the parties did so, <u>see</u> ECF No. 61; ECF No. 62; ECF No. 63.

In ruling on the motions, the court has considered:  (1) plaintiff's complaint, ECF No. 1; (2) the AR, ECF No. 15, ECF No. 18;[2] (3) plaintiff's motion for judgment on the AR, ECF No. 34; (4) intervenor-defendant's cross-motion for judgment on the AR and response to plaintiff's motion, ECF No. 36; (5) defendant's cross-motion for judgment on the AR and response to plaintiff's motion, ECF No. 44; (6) plaintiff's reply in support of its motion and response to the cross-motions, ECF No. 54; (7) intervenor-defendant's reply in support of its cross-motion, ECF No. 56; (8) defendant's reply in support of its cross-motion, ECF No. 58; (9) defendant's supplemental brief, ECF No. 61; (10) intervenor-defendant's supplemental brief, ECF No. 62; and (11) plaintiff's supplemental brief, ECF No. 63.

The motions are now fully briefed, and ripe for decision.  The parties did not request oral argument, and the court deems such argument unnecessary.  The court has considered all of the parties' arguments and addresses the issues that are pertinent to the court's ruling in this opinion.  For the following reasons, plaintiff's motion for judgment on the AR is **DENIED**, and defendant's and intervenor-defendant's cross-motions for judgment on the AR are **GRANTED**.

---

[2]     When defendant initially filed the administrative record (AR) on March 24, 2021, <u>see</u> ECF No. 15, it included a redacted version of the documents under "Tab 68 of the [AR]," and plaintiff requested an unredacted version.  <u>See</u> ECF No. 16 at 1 (defendant's motion to amend the AR).  Defendant therefore moved to complete the AR on April 2, 2021, to include the unredacted version of the document.  <u>See id.</u>  The court granted the motion and directed defendant to file the amended document as a separate docket entry.  <u>See</u> ECF No. 17 (order). Defendant did so on April 2, 2021.  <u>See</u> ECF No. 18.

I.      Background[3]

        A.      The Solicitation

        On November 12, 2019, the VA issued solicitation number 36C10B19R0046, for
IT services as part of the Transformation Twenty-One Total Technology Next Generation
(T4NG) contract on-ramp program (the solicitation).[4]  See ECF No. 15-1 at 463-598
(solicitation).  The procurement provides for a five-year contract base period and one
five-year option period, with a maximum value of $22.3 billion.  See id. at 469, 478.  The
solicitation explained the scope of the procurement as follows:

> The Contractor shall provide total IT services solutions including the
> following functional areas:  program management, strategy, enterprise
> architecture and planning; systems/software engineering; software
> technology demonstration and transition; test and evaluation; independent
> verification and validation; enterprise network; enterprise management
> framework; operations and maintenance; cybersecurity; training; IT
> facilities; and other solutions encompassing the entire range of IT and Health
> IT requirements, to include software and hardware incidental to the solution.
> Accordingly, Task Orders may include acquisitions of software and IT
> products . . . .  These services, as well as related IT products, may encompass
> the entire life-cycle of a system.  Moreover, services and related products
> covered under this contract shall be global in reach and the Contractors must
> be prepared to provide services and deliverables worldwide.

Id. at 474.

        The solicitation was issued "anticipating that a significant number of the [service-
disabled veteran-owned small business (SDVOSB)] contractors would no longer qualify
as SDVOSBs" at the end of the initial five-year contract period.  ECF No. 44 at 9 (citing
ECF No. 15-1 at 425, 463).  The solicitation also explained that "[t]his competition is
being conducted pursuant to the on-ramp clause of the T4NG basic contract.  The
Government intends to award seven (7) contracts to verified [SDVOSBs]."  ECF No. 15-
1 at 594.  The VA, however, reserved the right to adjust that number in its discretion.  See
id.  Awards were to be made on a best-value basis, considering five evaluation factors,
including "Technical, Past Performance, Veterans Employment, Small Business

---

[3]     This case involves considerable detail.  For purposes of deciding these motions the court
will relate only those details that are necessary to the instant analysis.

[4]     The copy of the solicitation included in the AR is not dated, but the index filed by
defendant, see ECF No. 15-24 at 3, and presentation slides from the Source Selection Advisory
Council's May 27, 2020 initial evaluation briefing, see ECF No. 15-3 at 310, indicate that the
solicitation was issued on November 12, 2019.

Participation Commitment Factor (SBPC), and Price." Id.  Those factors were valued as follows:

> The Technical Factor is significantly more important than the Past Performance Factor, which is slightly more important than the Veterans Employment Factor which is slightly more important than the SBPC Factor, which is slightly more important that the Price Factor.  The Technical Factor has two (2) Sub-factors:  Sample Task Sub-Factor and Management Sub-factor.  Within the Sample Task Sub-factor, Sample Task 1 and Sample Task 2 are equally important.  The Sample Task Sub-factor is significantly more important than the Management Sub-factor.  All non-price factors, when combined, are significantly more important than the Price Factor.  To receive consideration for award, a rating of no less than "Acceptable" must be achieved for the Technical Factor, all Technical Sub-factors, and the SBPC Factor.  Offerors are cautioned that the awards may not necessarily be made to the lowest Price offered or the most highly rated technical proposals.

Id.

To promote an efficient evaluation process, the solicitation contemplated that "the evaluation [would] be conducted in phases, Step One and Step Two." Id.  For Step One, the offerors were directed to submit a technical proposal and price proposal responding to Sample Task 1.  See id. at 585-86.  Following an evaluation of the Sample Task 1 response, the VA was to establish a competitive range, and select the offerors eligible to proceed to Step Two.  See id. at 594.  Offerors that did not advance to Step Two would be excluded from the competition, and those that proceeded were to submit a response to "Sample Task 2, the Management Sub-Factor, Past Performance Factor, Veterans Employment Factor, SBPC Factor, and Solicitation, Offer & Award Documents, Certifications & Representations and Terms and Conditions." See id. at 595.  Following evaluation of Step Two proposals, the VA "may establish a competitive range and conduct discussions with all Offerors within the competitive range, or proceed directly to award without discussions." Id.

The sample tasks were intended to test the "Offeror's expertise and innovative capabilities to respond to the types of situations that may be encountered in performance of a contract resulting from this solicitation." Id. at 596.  For this reason, "the Offerors [were not] given an opportunity to correct or revise a Sample Task response." Id.  Responses to the sample tasks were evaluated in accord with the following:

> (1)    Understanding of Problems—The proposal will be evaluated to determine the extent to which the Offeror demonstrates a clear understanding of all features involved in solving the problems and meeting the requirements

4

presented by the Sample Task; and the extent to which uncertainties are identified and resolutions proposed.

(2)    Feasibility of Approach—The proposal will be evaluated to determine whether the Offeror's methods and approach to meeting the Sample Task requirements provides the Government with a high level of confidence of successful completion.

Id.  And, considering the foregoing criteria, each sample task response was assigned one of the following overall adjectival ratings:

a.    Outstanding—A proposal that meets or exceeds all of the Government's requirements, contains extensive detail, demonstrates a thorough understanding of the problems, and is highly feasible (low risk).

b.    Good—A proposal that meets or exceeds all of the Government's requirements, contains at least adequate detail, demonstrates at least an understanding of the problems, and is at least feasible (low to moderate degree of risk).

c.    Acceptable—A proposal that at least meets all of the Government's requirements, contains at least minimal detail, demonstrates at least a minimal understanding of the problems, and is at least minimally feasible (moderate to high degree of risk).

. . . .

e.    Unacceptable—A proposal that contains a major error(s), omission(s), or deficiency(ies) that indicates a lack of understanding of the problems or an approach that cannot be expected to meet requirements or involves a very high risk; and none of these conditions can be corrected without a major rewrite or revision of the proposal.  A proposal that fails to meet any of the Government's requirements after the final evaluation shall be ineligible for award regardless of whether it can be corrected without a major rewrite or revision of the proposal.

ECF No. 15-3 at 23 (subsection d is omitted because it is inapplicable to evaluations of the sample tasks).

The solicitation also provided that the offerors' labor rate proposals would be evaluated "to determine whether [each rate] is unrealistically low," and cautioned that "a single proposed unrealistically low labor rate will result in a deficiency that may render its proposal ineligible for award."  ECF No. 15-1 at 598; see also ECF No. 15-3 at 490 (May 18, 2020 memorandum regarding price evaluation methodology).  To perform the

evaluation, the agency would employ two methodologies, including "reviewing each labor rate proposed compared to the current T4NG [indefinite delivery, indefinite quantity (IDIQ)] contract labor rates for each corresponding labor category," and "utilizing Tukey's rule to identify any outliers of rates proposed."  ECF No. 15-3 at 490.  The agency would begin the price evaluation by comparing the proposed labor rates with the current T4NG IDIQ contract labor rates, and if any proposed rate "fell below the range of labor rates" on the current contract, "the Tukey rule was used" to determine if the rate was an outlier, and "therefore may be unrealistically low."[5]  Id. at 491.  The agency explained that this process was "reasonable and appropriate" because "Tukey's rule has been shown to be a reliable statistical analysis tool," and "since the dataset for Tukey consists of rates proposed in response to the Solicitation, there was adequate price competition that can be relied upon to identify unrealistically low labor rates."  Id.  The agency further explained that because the offerors proposed "blended rates . . . rather than for specific requirements," the price evaluation "necessitate[d] a more liberal analysis that identifies individual rates that pose a performance risk, as opposed to a scenario with well-defined requirements."  Id. at 491-92.

B.     Sample Task 1

In Sample Task 1, the VA sought responses to the following hypothetical scenario:

> The U.S. Department of Veterans Affairs (VA) signed a multi-year contract to modernize its electronic health record (EHR) system and to replace its legacy Veterans Information Systems and Technology Architecture (VISTA) system.  VA's infrastructure/Information Technology (IT) components will need to be analyzed, reported, prioritized, remediated, and tracked to prepare VA for the new EHR system.   Using the T4NG Performance Work Statement, describe in detail your approach to analyze, remediate, and report VA infrastructure/IT deficiencies across the organization to prepare VA facilities for the new EHR system.

ECF No. 15-1 at 665.  The language of Sample Task 1 incorporated by reference the requirements included in the performance work statement (PWS), which is part of the solicitation.  See id. at 470-533.  The VA gave offerors seven business days to submit their responses, which were limited to a maximum of twenty-five pages.  See id. at 432.

To assist in evaluating the Sample Task 1 responses, the VA "prepared a model answer for sample task one" that "identified all of the high level focus areas that an offeror would need to address in order to successfully execute the effort, as well as lower-

---

[5]     Tukey's rule is an analysis tool that utilizes quartiles of the data being analyzed and a mathematical formula to identify price outliers.  See ECF No. 15-3 at 491.

level focus areas that were intrinsic to each high level focus area." ECF No. 44 at 27 (citing ECF No. 15-14 at 593).

The Sample Task 1 responses were assigned strengths, weaknesses, or deficiencies in each of the five high level focus areas, according to the following criteria:

<u>Strength</u>. Any aspect of a proposal that, when judged against a stated evaluation criterion, enhances the merit of the proposal or increases the probability of successful performance of the contract. A significant strength appreciably enhances the merit of a proposal or appreciably increases the probability of successful contract performance.

<u>Weakness</u>. A flaw in a proposal that increases the risk of unsuccessful contract performance. A significant weakness in a proposal is a flaw that appreciably increases the risk of unsuccessful contract performance.

<u>Deficiency</u>. A material failure of a proposal to meet a Government requirement, or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.

ECF No. 15-3 at 67. Strengths and weaknesses were to be assigned only for the high level focus areas. <u>See</u> ECF No. 15-13 at 1492.

The VA subsequently issued an amendment to the solicitation to "1) Revise portions of the Proposal Format requirements as provided within Section L.10 of the Solicitation; and, 2) Allow for resubmittal of only the Sample Task 1 as necessary to ensure the instructions are met as described below." ECF No. 15-1 at 674. The VA stressed that:

The Technical Evaluation Approach, as stated within Section M.C.1.a of the Solicitation, remains unchanged; Offerors are only being provided this limited opportunity to resubmit Sample Task 1 to ensure compliance with Section L.10.2.a, Format, as amended herein. Future opportunities to correct or revise a Sample Task response will not be provided.

<u>Id.</u> It further noted that, "Offerors are reminded and cautioned that all Solicitation requirements, as amended herein, to include proposal formatting, must be strictly adhered to." <u>Id.</u> In response to the amendment, all offerors resubmitted their proposals. <u>See</u> ECF No. 15-2 at 511-835 (offerors' revised Sample Task 1 proposals).

C.      Organizational Conflict of Interest Determination

Because Sample Task 1 involved the electronic health record modernization (EHRM) system and, in 2018, the VA signed a multi-year contract with Cerner Corporation to replace that system, the contracting officer reviewed the task to "determine if Cerner Corporation or any of its subcontractors performing under the EHRM contract would have an Organizational Conflict of Interest (OCI) with the T4NG On-Ramp solicitation as a result of information that may cause an unfair competitive advantage." ECF No. 15-1 at 420. The contracting officer considered Federal Acquisition Regulation (FAR) 9.505(b), which defines OCIs, and consulted the Source Selection Evaluation Board (SSEB) Chairperson "who led the effort in developing Sample Task 1 and its corresponding solution." Id. at 419-20. The contracting officer "confirmed that in order to provide a response to the Sample Task 1 question, Offerors do not need any non-public knowledge of [EHRM] end state requirements, nor would access to any non-public information pertaining to EHR provide an Offeror with a competitive advantage." Id. Instead, Sample Task 1 required a detailed overview of the offeror's approach to "analyze, remediate, and report VA infrastructure/IT deficiencies," which "would be essentially the same for any other major IT system similar in size and scope; therefore, [it] is not specific to the EHR system." Id. at 420.

The contracting officer concluded that, because "the solution to Sample Task 1 does not require the Offerors to have any non-public knowledge of Cerner or []EHRM end state requirements, any proprietary information Cerner or any of its subcontractors have as a result of the EHRM contract, would not present an unfair competitive advantage." Id. (footnote omitted). This conclusion "extends to other contractors that may have indirectly supported EHRM efforts through contracts and orders beyond the Cerner EHRM contract." Id. at n.1. Thus, the contracting officer determined that no OCI existed "that would preclude Cerner or any of its subcontractors from participating in the solution." Id.

D.      First Competitive Range Determination

Of the ninety-four proposals evaluated by the VA, "61 proposals were rated 'Unacceptable;' 21 proposals were rated 'Acceptable;' eight (8) proposals were rated 'Good;' and four (4) proposals were rated 'Outstanding.' The evaluated prices of the 94 offerors ranged from a low of $6.13 Billion to a high of $16.33 Billion." ECF No. 15-3 at 485 (June 4, 2020 Source Selection Authority (SSA) memorandum for record determining competitive range); see also id. at 442 (May 27, 2020 SSA Step One Evaluation Summary). The agency determined that the offerors' labor rates were "realistic" because only a small portion of the labor rates fell below the IDIQ contract rates and those that did were above the Tukey threshold and "consistent with competitive

pricing."[6]  Id. at 492 (May 18, 2020 memorandum regarding price evaluation methodology).

In determining the competitive range, the SSA excluded all offerors with "unacceptable" Sample Task 1 ratings.  See id. at 485.  The SSA determined that excluding the sixty-one unacceptable proposals was appropriate because "Sample Task 1 was significantly more important than Price."  Id. at 486.  The SSA also noted that "there was ample competition among Offerors with 'Acceptable' or better technical proposals with low evaluated prices."  Id.  The contracting officer concurred with the SSA's conclusion and thirty-three offerors were included in the competitive range for evaluation in Step Two.  See id.

E.      Step Two Evaluation and Competitive Range Determination

The VA released Sample Task 2 to the offerors in the competitive range on June 30, 2020; proposals were due on July 10, 2020.  See ECF No. 15-3 at 501 (email releasing Sample Task 2); ECF No. 15-13 at 1483 (October 20, 2020 SSA Interim Evaluation Briefing).  Offerors were required to provide, in addition to their response to Sample Task 2, the management proposal—including all contractor teaming agreements (CTAs)—and past performance, Veterans employment, and small business participation proposal volumes.  See ECF No. 15-1 at 588.  The SSEB then evaluated the proposals and presented the results of its evaluation to the Source Selection Advisory Council (SSAC) and the SSA in a "detailed slide presentation and thorough discussion of the evaluation assessments pertaining to each Step Two proposal."  ECF No. 15-13 at 1685 (October 23, 2020 SSA Memorandum for Record re: Step Two Competitive Range Determination).  In summary, the proposals were rated as follows:

24 proposals were rated "Acceptable," eight (8) proposals were rated "Good," and one (1) proposal was rated "Outstanding" in the Technical Factor. All 33 proposals were rated "Low Risk" in the Past Performance Factor. In the Veterans Employment Factor, the 33 proposals ranged from eight (8) to 18,182 employees and one (1) to 4,574 Veteran employees, and the percentage of Veterans employed ranged from 4.41 percent to 71.08 percent. For the SBPC Factor, four (4) proposals were rated "Susceptible to Being Made Acceptable," two (2) proposals were rated "Acceptable," ten (10) were rated "Good," and 17 were rated "Outstanding." The evaluated prices ranged from a low of $6.62 billion to a high of $10.48 billion.

Id. at 1685-86; see also id. at 1681-82 (SSEB Step Two Evaluation Summary).

---

[6]      Only one offeror was determined to have proposed prices that were "unrealistically low." ECF No. 15-3 at 492.  That offeror's proposal is not at issue in this protest and the court will not detail the full analysis of the offeror's prices here.

The SSA considered "all factors and sub-factors and their relative importance," and determined that offerors rating "Acceptable" in the technical factor should be excluded from the competitive range because "they were not among the most highly rated proposals with a realistic prospect for award." Id. at 1687. The SSA determined that "reviewing the detailed findings" of the offerors' evaluations revealed that those rated "Acceptable" "presented a higher degree of risk in the Sample Task responses than those Offerors rated 'Good' or better in the Technical Factor." Id. The SSA also considered the offerors' past performance—the second most important factor as defined by the solicitation—and determined that, although they were each "assessed a varying number of weaknesses, each was considered Low Risk and therefore essentially equal in that Factor." Id.

The SSA also "considered the fact" that some of the offerors rated "Acceptable" in the technical factor "were stronger in the remaining factors . . . and/or proposed lower evaluated prices" than higher rated offerors. Id. The SSA determined that, given the relative importance of the technical factor and past performance factor, "none of these differences were significant enough to outweigh the 'Good' or better ratings received for the Technical Factor." Id. The contracting officer concurred with the SSA's determination that the nine offerors that received "Good" or better ratings in the technical factor would compose the competitive range for discussions. Id. at 1688.

After discussions and final proposal revisions, the SSEB presented the SSA with the final results of evaluation on November 18, 2020. See ECF No. 15-16 at 570. The SSA determined to award contracts to all nine offerors in the competitive range for award, see id. at 571, the contracting officer determined that all nine offerors proposed fair and reasonable prices, see id., and the VA issued its Source Selection Decision awarding contracts to each of the nine offerors in the competitive range, see id. at 572-73.

F.   Plaintiff's Evaluation

Plaintiff was given an "Acceptable" rating for Sample Task 1 and "Good" for Sample Task 2. ECF No. 15-13 at 758 (the VA's Technical Factor Initial Evaluation Report for plaintiff's proposal). Plaintiff's Sample Task 1 rating was based on an assessment of one significant strength and four weaknesses. See id. at 759-63. The weaknesses were the result of plaintiff's proposal providing only "minimal detail" in demonstrating its understanding of the "enterprise high level planning" needed to address the agency's "infrastructure/IT deficiencies," id. at 760, and in its approach to "analyz[ing] and remediat[ing] VA's IT Network deficiencies," id. at 761, "IT infrastructure deficiencies," id. at 762, and "IT component deficiencies," id. The evaluation explained that this lack of detail "adds risk" to the project in various ways. Id. at 760-62. Plaintiff's Sample Task 2 was given one significant strength, four strengths, and one weakness. See id. at 764-66.

"Based on the relative importance of the sample tasks, wherein each sample task was of equal importance, and considering the qualitative evaluation results of the individual sample tasks," plaintiff received an overall "Sample Task Subfactor rating of **ACCEPTABLE**." Id. at 758 (emphasis in original). Plaintiff received a management subfactor rating of "**Acceptable**," based on one assessed strength. Id. at 768 (the VA's Technical Factor Management Subfactor Initial Evaluation Report) (emphasis in original). "Based on the evaluation results of the Technical subfactors and with due consideration given to the weights for those subfactors," plaintiff received an overall rating for the technical factor of "**ACCEPTABLE**." Id. at 752 (emphasis in original).

Plaintiff was rated "Low Risk" on the past performance factor, id. at 770-75, had a veterans employment percentage of ten percent, see id. at 776, and received a rating of "**GOOD**" for its small business participation factor, id. at 777-78 (emphasis in original). Plaintiff proposed an evaluated price of $7,070,703,559.69. See id. at 1686 (summarizing the offerors' proposed prices). The offerors' proposed prices ranged from "a low of $6.62 billion to a high of $10.48 billion." Id.

G.   Procedural History

The VA informed plaintiff that it was not included in the competitive range and had, therefore, been eliminated from the competition on October 23, 2020. See ECF No. 15-13 at 1690-91. Plaintiff requested a debriefing on its evaluation, which the VA provided on November 3, 2020. See ECF No. 15-14 at 579-636. Plaintiff filed a protest of its exclusion from the competitive range with the Government Accountability Office (GAO) on November 16, 2020. See ECF No. 15-18 at 1319-54. The GAO denied the protest on February 23, 2021, see ECF No. 15-20 at 429-38, and plaintiff filed its complaint in this court on March 16, 2021, see ECF No. 1.

II.   Legal Standards

In its complaint, plaintiff invokes this court's bid protest jurisdiction. See ECF No. 1 at 2. This court's bid protest jurisdiction is based on the Tucker Act, which gives the court authority:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1). The Tucker Act also states that the court may grant "any relief the court considers proper . . . including injunctive relief." 28 U.S.C. § 1491(b)(2).

To establish jurisdiction, a plaintiff must therefore demonstrate that it is an "interested party." 28 U.S.C. § 1491(b)(1). The Federal Circuit has held that the "interested party" requirement "imposes more stringent standing requirements than Article III." Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). Though the term "interested party" is not defined by the statute, courts have construed it to require that a protestor "establish that it '(1) is an actual or prospective bidder and (2) possess[es] the requisite direct economic interest." See id. (quoting Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006)) (alteration in original).

Once jurisdiction is established, the court's analysis of a "bid protest proceeds in two steps." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the court determines, pursuant to the Administrative Procedure Act standard of review, 5 U.S.C. § 706, whether the "agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013) (citing 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706)). If the court finds that the agency acted in error, the court then must determine whether the error was prejudicial. See Bannum, 404 F.3d at 1351.

To establish prejudice, "a protester must show 'that there was a substantial chance it would have received the contract award but for that error.'" Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). "In other words, the protestor's chance of securing the award must not have been insubstantial." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (citations omitted). The substantial chance requirement does not mean that plaintiff must prove it was next in line for the award but for the government's errors. See Sci. & Mgmt. Res., Inc. v. United States, 117 Fed. Cl. 54, 62 (2014); see also Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract."). But plaintiff must, at minimum, show that "had the alleged errors been cured, . . . 'its chances of securing the contract [would have] increased.'" Precision Asset Mgmt. Corp. v. United States, 125 Fed. Cl. 228, 233 (2016) (quoting Info. Tech., 316 F.3d at 1319).

Given the considerable discretion allowed contracting officers, the standard of review is "highly deferential." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000). As the Supreme Court of the United States has explained, the scope of review under the "arbitrary and capricious" standard is narrow. See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974). "A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and "[t]he court is not empowered to substitute its judgment for that of the agency.'" Id. (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)); see also Weeks Marine,

575 F.3d at 1368-69 (stating that under a highly deferential rational basis review, the court will "sustain an agency action 'evincing rational reasoning and consideration of relevant factors'") (citing Advanced Data Concepts, 216 F.3d at 1058).

III.   Analysis

According to plaintiff, "the VA's evaluation and competitive range determination was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law." ECF No. 34 at 8.  Specifically, plaintiff argues that the VA's evaluation was flawed because:  (1) it failed to properly conduct the price realism evaluation, see id. at 17-25; (2) it "overlooked aspects of [plaintiff's] proposal and offered explanations contrary to other evaluation findings" in its evaluation of plaintiff's Sample Task 1 proposal, see id. at 25, 25-34; (3) it treated offerors unequally when it failed to exclude an offeror that did not abide by the solicitation requirements, see id. at 34-38; and (4) it "failed to look behind the adjectival ratings," and failed to make the "required, meaningful consideration of price," in establishing the competitive range, id. at 38, 38-44.

Defendant responds that "each protest ground lacks merit."  ECF No. 44 at 8. Defendant argues that:  (1) "the agency fairly and reasonably conducted its price realism analysis," id. at 18; see also id. at 18-26; (2) "there was a rational basis for each of the weaknesses assigned to [plaintiff's] sample task one proposal," id. at 28; see also id. at 26-38; (3) the VA reasonably evaluated the management subfactor and did not engage in disparate treatment, see id. at 38-41; and (4) plaintiff's assertions about the establishment of the competitive range are "plainly refuted by the administrative record," id. at 42; see also id. at 42-47.  Defendant further contends that plaintiff does not have standing to challenge the VA's inclusion of intervenor-defendant in either the first or second competitive range determination, or its price evaluation and second competitive range determination.  See ECF No. 61 at 7-9.  This is so, according to defendant, because plaintiff "cannot establish that there was a substantial chance it would have received a contract award but for the alleged errors relating to [intervenor-defendant's] inclusion in the competitive ranges."  Id. at 8.  And, plaintiff cannot demonstrate prejudice as to the agency's price evaluation and competitive range determination because, while its price was "amongst the lowest proposed prices," plaintiff's acceptable rating on the technical factor was "significantly more important" in the evaluation.  Id. at 9 (citations and quotation marks omitted).

Intervenor-defendant notes that, in addition to defendant's arguments, plaintiff cannot have been prejudiced by its evaluation because its "inclusion in the competitive range did not prevent [plaintiff] from also making the competitive range."  ECF No. 36-2 at 5 (memorandum in support of cross-motion).  Put another way, "if [intervenor-

defendant] were excluded from the competitive range, it would not mean that [plaintiff] would be included."[7]  Id.

A.    Plaintiff Has Standing to Protest Its Exclusion from the Competitive Range

The record is clear that, for standing purposes, plaintiff was an actual offeror in the subject procurement.  See Weeks Marine, 575 F.3d at 1359; see also ECF No. 1 at 2; ECF No. 15-1 at 715-69.  Thus, to establish standing plaintiff must demonstrate that it has a direct economic interest in the procurement.  See Weeks Marine, 575 F.3d at 1359.  To demonstrate a direct economic interest sufficient to support standing, plaintiff must both show that it had a substantial chance of award and show that it was prejudiced by the agency's action.  See Wis. Physicians Serv. Ins. Co. v. United States, 151 Fed. Cl. 22, 30 (2020).  In short, plaintiff "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."  Info. Tech., 316 F.3d at 1319 (citing Alfa Laval, 175 F.3d at 1367).  To make the appropriate showing, plaintiff must demonstrate "more than a bare possibility of receiving the award."  Precision Asset, 125 Fed. Cl. at 233 (citing Bannum, 404 F.3d at 1358) (affirming the trial court's determination that the plaintiff had not demonstrated a substantial chance of award when its "argument rest[ed] on mere numerical possibility, not evidence").

An offeror that was properly eliminated from the competition as "untimely, technically unacceptable, or otherwise failing to merit consideration as a finalist," only has standing to challenge its elimination from the competition and lacks standing to challenge any agency action subsequent to its elimination.  Wis. Physicians, 151 Fed. Cl. at 30-31 (citing Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1380-81 (Fed. Cir. 2009)).  In Wisconsin Physicians, the court held that an offeror eliminated from competition as technically unacceptable had standing to challenge its own proposal evaluation.[8]  See id. at 32.  After it found that the agency's evaluation and plaintiff's elimination as technically unacceptable were appropriate, the court went on to hold that plaintiff did not have standing to challenge any agency action after its elimination, including a potential OCI.  See id. at 43-44.

Defendant concedes that under the standing test, and applying the reasoning in Wisconsin Physicians, plaintiff has standing to challenge "the agency's evaluation of its proposal," but argues that it does not have standing to bring the rest of its claims.  ECF No. 61 at 6.  Plaintiff, however, argues that it has standing to pursue all of its claims

_____

[7]    Because intervenor-defendant's arguments track closely with defendant's arguments, the court will not separately discuss intervenor-defendant's arguments unless they are both different from the arguments made by defendant and pertinent to this decision.

[8]    While not binding, the court finds the reasoning in Wisconsin Physicians Service Insurance Co. v. United States, 151 Fed. Cl. 22 (2020), persuasive.

because its "chance of securing the award upon a new evaluation of the offerors' proposals would not be 'insubstantial,'" ECF No. 63 at 4, and its "challenges concerning the Agency's evaluation of [intervenor-defendant's] proposal occurred while [plaintiff] was still in the competition," id. at 5 (emphasis in original).

The court agrees with the parties that plaintiff has standing to challenge its own evaluation.  In the court's view, plaintiff has demonstrated that it had a substantial chance of being included in the competitive range.  Plaintiff need not show actual causation to make such a showing.  See Bannum, 404 F.3d at 1358 ("This test is more lenient than showing actual causation.").  Plaintiff's position as a technically acceptable offeror that was not included in the competitive range, along with the alleged flaws in the VA's evaluation, are sufficient to establish plaintiff's substantial chance of inclusion in the competitive range.  See Info. Tech., 316 F.3d at 1319.  Thus, as in Wisconsin Physicians, plaintiff has alleged errors in its technical evaluation and error in consideration of its price that, if valid, could have placed plaintiff within the final competitive range.  See Wis. Physicians, 151 Fed. Cl. at 32.

The court, however, cannot make a determination about plaintiff's standing to protest the agency's actions subsequent to plaintiff's elimination until it has determined whether the agency appropriately evaluated plaintiff's proposal.  See id. at 30.

      B.     The VA's Evaluation of Plaintiff's Proposal Was Not Arbitrary or Capricious

          1.     The VA Appropriately Conducted Its Price Realism Analysis

In its motion, plaintiff argues that the agency's "price realism evaluation was flawed in multiple respects," including:  (1) its failure to "evaluate all proposed labor rates as proscribed by the Solicitation"; (2) its comparison of the labor rates to the T4NG IDIQ rates without explanation as to why that "formed a valid benchmark for comparison"; and (3) its use of all proposals' labor rates, including those ultimately deemed unacceptable.  ECF No. 34 at 17.  Defendant responds that plaintiff's assertions are "simply untrue," ECF No. 44 at 18, and the methodologies used by the VA were "reasonable and correctly applied," id. at 20.

According to plaintiff, the VA failed to evaluate the outside the continental United States (OCONUS) labor rates in contravention of the solicitation's notice that "each proposed labor rate" would be evaluated.  ECF No. 34 at 18 (citing ECF No. 18 at 1-70).  Defendant points to the record and argues that the agency's memorandum explaining its methodology "expressly indicated that '**each proposed labor rate**' was evaluated."  ECF No. 44 at 18 (quoting ECF No. 15-3 at 490) (emphasis in original).  According to defendant, the spreadsheet plaintiff cites as evidence that the agency failed to consider all rates did not include the OCONUS rates because "only 'on-site and off-site labor rates fell below the range of labor rates for each of the evaluated [labor categories] on the

current T4NG IDIQ contract' as well as the corresponding Tukey fences." Id. at 19 (quoting and citing ECF No. 15-3 at 491; ECF No. 18 at 1) (emphasis in original). Plaintiff replies that "there is no document in the record that contains the actual contents of the required substantive analysis" of the OCONUS rates. ECF No. 54 at 6.

The court agrees with defendant that the record reflects that the agency evaluated each labor category as required by the solicitation. See ECF No. 15-3 at 490-92. As the agency explained in its memorandum detailing its price evaluation methodology, the agency evaluated "each proposed labor rate" and "if any of the proposed labor rates fell within the range of labor rates on the current T4NG IDIQ contract . . ., the proposed labor rates were considered to be realistic." Id. at 490-91 (footnote omitted). Thus, where the proposed labor rate "fell within the range of labor rates on the current T4NG IDIQ contract those rates were able to be determined as realistic based upon the performance history of the ongoing contract without relying on the Tukey fence." Id. at 491 n.1. The memorandum goes on to explain that only for those "on-site and off-site labor rates that fell below the range of labor rates" on the current contract did the agency employ the Tukey rule. Id. at 491. On that record, the court cannot credit plaintiff's assertion that the agency failed to evaluate the offerors' OCONUS rates.

Plaintiff next argues that there is "nothing in the record that explains whether or how the VA concluded that the 'minimum T4NG basic IDIQ' rates were comparable to those offered by offerors under the current procurement." ECF No. 34 at 19. According to plaintiff, the record does not reflect how the agency calculated the rates or whether the rates were "blended and loaded," like the proposed rates. Id. This, plaintiff contends, could lead to "materially understated rates and . . . result[] in misleading conclusions regarding the realism" of the proposed rates. Id. Defendant responds that the rates were comparable because they were "already under contract for the exact same acquisition." ECF No. 44 at 20-21. According to defendant, "[i]t is only logical that when on-ramping companies into an existing IDIQ contract, the new companies would be on-ramped under the same requirements as the current contract holders." Id. at 21.

Likewise, plaintiff challenges the agency's calculation of the Tukey Method's "lower fences." ECF No. 34 at 20. Plaintiff contends that by using the pricing data from all offerors, including those found to be technically unacceptable, the VA "critically miscalculated" the rates. Id. According to plaintiff, the use of all rates, "significantly distorted the accuracy and reliability of the resultant 'lower fences,' resulting in 'realistic' rate ranges for some labor categories with the 'lower fence' being as low as **less than $0/hour**." Id. at 21 (emphasis in original). Plaintiff points out that in its price reasonableness determination, the VA only reviewed the prices of the technically acceptable offerors. See id. at 22.

Defendant responds that the use and calculation of the Tukey rule was reasonable. See ECF No. 44 at 21-26. Defendant argues that plaintiff "provides no logical basis for

its suggestion that the agency was to selectively choose which proposed rates to include in the Tukey analysis and which to exclude." Id. at 23.  According to defendant, offerors that received an unacceptable rating, only received that rating on their sample task 1 proposals, and that rating "was not equivalent to an 'unacceptable' proposal." Id. at 24. Defendant further argues that plaintiff has a "fundamentally flawed understanding of the Tukey analysis." Id. at 25.  Defendant contends that the negative lower fences are not "distorted," rather they are an indicator that "there were no lower outliers based upon the proposed prices." Id.

In the court's view, the agency's price realism analysis was reasonable and rational.  The record demonstrates that the VA applied its analysis as stated in the solicitation and explained its application and methodology.  See ECF No. 15-3 at 490-92. If, as it has here, the VA has "articulate[d] a 'rational connection between the facts found and the choice made,'" the court will uphold the agency's decision.  Bowman, 419 U.S. at 285 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  The court perceives no failure to in the agency's calculations or clear error of judgment in its use of the T4NG IDIQ contract as a labor rate comparison that would support overturning the agency's conclusions.  See id.  Instead, it appears that plaintiff's challenges to the VA's price realism evaluation amount to disagreements with the VA's conclusions.

### 2.    The VA Applied the Evaluation Criteria Appropriately

Plaintiff next argues that the agency "arbitrarily and irrationally assigned" it four weaknesses for its Sample Task 1 proposal.  ECF No. 34 at 25.  According to plaintiff, in assessing each of the weaknesses, the VA "fail[ed] to consider information in [plaintiff's] own proposal and ignore[d] (and **contradict[ed]**) earlier conclusions reached" by the agency itself in its evaluation.[9]  Id. at 26-27 (emphasis in original); see also id. at 30-32 (arguing the same for each weakness).  Defendant responds that "there was a rational basis for each of the weaknesses assigned" to plaintiff's proposal.  ECF No. 44 at 28. Defendant argues that plaintiff's complaint "boils down to nothing more than a mere disagreement with the thoroughness of the agency's evaluation . . . . [and] the thoroughness of the agency's findings further demonstrates that the agency properly reviewed and assessed [plaintiff's] proposal."  Id. at 32.  Defendant further contends that any "comments regarding the positive aspects of [plaintiff's] proposal do not render [the agency's] comments regarding the negative aspects of [plaintiff's] proposal obsolete." Id. at 33.

---

[9]     To the extent that plaintiff argues that the agency treated other offerors differently as it relates to each of plaintiff's weaknesses, the court declines to consider that argument, made for the first time in plaintiff's reply.  See ECF No. 54 at 20-22; see also United States v. Ford Motor Co., 463 F.3d 1267, 1276 (Fed. Cir. 2006) ("Arguments raised for the first time in a reply brief are not properly before this court.").

A careful review of plaintiff's cited examples of allegedly irrational or unreasonable treatment of its proposal reveals that the agency's evaluation was thorough and reasoned.  See ECF No. 15-13 at 759-63.  Plaintiff's examples of purportedly unreasonable evaluation represent differences of opinion with the conclusions the VA drew about plaintiff's proposal.  See, e.g., ECF No. 34 at 28-29 (addressing plaintiff's example of the agency's treatment of its essential personnel evaluation); ECF No. 15-13 at 760 (discussing the weakness the agency found in plaintiff's personnel proposal).  The court will not involve itself in the inappropriate "second guessing of 'minutiae'" for which plaintiff presses.  Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 588 (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996)).  The court is satisfied that the VA closely reviewed plaintiff's proposal and evaluated it reasonably and consistently with the solicitation.  Id.  Rather, in the court's view, the evaluation flaws of which plaintiff complains amount to a strong disagreement with the conclusions the VA drew during its evaluation.

The court cannot and will not substitute its judgment for that of the agency when the agency has clearly articulated a rational connection between facts and conclusions about distinguishable proposals.  See Bowman, 419 U.S. at 285.  Plaintiff's claims related to the VA's evaluation of its proposal must, therefore, fail.

### 3.  The VA Appropriately Applied All Evaluation Criteria

Plaintiff argues that the VA "failed to look behind the adjectival ratings," ECF No. 34 at 38, and "mechanically excluded all offerors receiving an 'acceptable' rating," id. at 39.  According to plaintiff, "there is nothing in the record to suggest that the SSA . . . reached her competitive range determination based on all five (5) evaluation factors identified in the Solicitation," id. (emphasis in original), including price, see id. at 42-44.

Review of the record, however, reveals that the VA's evaluation was detailed and reasoned, and included review and discussion of each of the evaluation factors and how they weighed against each other.  See ECF No. 15-13 at 1683-88.  The VA's review included:

(1)  Detailed price evaluations for each offeror, see ECF No. 15-3 at 191-242 (initial price evaluations); id. at 243-94 (interim price evaluations);

(2)  An initial 147-slide briefing related to the evaluation of Sample Task 1, which included information about the strengths and weaknesses of each offeror and a detailed price evaluation, see id. at 295-442 (May 27, 2020 Initial Evaluation Briefing slide presentation);

(3)  An initial competitive range determination memorandum, and a confirmation of that determination after items for negotiation were considered, see id. at 483-89;

(4)     A memorandum laying out the agency's price realism evaluation methodology and findings, see id. at 490-92, and a spreadsheet containing the detailed price realism evaluation, see ECF No. 18 at 1-70;

(5)     Evaluation reports for each offeror that included a detailed overview of the assessed strengths and weaknesses for the sample tasks and management proposal, the past performance summary and weaknesses, the veterans employment calculation, and the strengths and weaknesses of the small business participation levels, see ECF No. 15-13 at 752-1120;

(6)     A second, more than 200-slide, presentation that included details about the strengths and weaknesses of each offeror's Sample Task 2 and management proposals, a detailed review of each offeror's past performance, a calculation of each offeror's veterans employment percentage, and a review of each offeror's small business participation, see id. at 1468-1682 (October 20, 2020 Interim Evaluation Briefing slide presentation); and

(7)     A final competitive range determination memorandum explaining the SSA's and contracting officer's review of the evaluation and rationale for their decision-making, see id. at 1683-88.

Reviewing each of these evaluations, it appears to the court that the VA specifically considered all of the relevant factors in assigning plaintiff its ratings.  See id. at 752-78.

Taking into account the breadth and detail of the VA's evaluation, the court cannot credit plaintiff's assertion that the VA "mechanically excluded" offerors without considering all evaluation factors and price.  ECF No. 34 at 39; see also id. at 39-44.  It is not in the court's purview to "'substitute its judgment for that of the agency.'"  Bowman, 419 U.S. at 285 (quoting Citizens to Preserve Overton Park, 401 U.S. at 416).  If, as it has here, the VA has "articulate[d] a 'rational connection between the facts found and the choice made,'" the court will uphold the agency's decision.  Id. (quoting Burlington Truck Lines, 371 U.S. at 168).  The court perceives no failure to consider relevant factors for evaluation or clear error of judgment by the VA that would support overturning the agency's conclusions.  See Bowman, 419 U.S. at 285.  Instead, it appears that plaintiff's challenges to the VA's evaluation of the proposals amount to disagreements with the VA's conclusions.

C.     Plaintiff Does Not Have Standing to Pursue Its Challenges to the Agency's Actions Subsequent to Its Elimination

Having found that the VA did not act arbitrarily or capriciously in evaluating plaintiff's proposal, and that plaintiff was thereby appropriately eliminated from the competition, the court now turns to the question of plaintiff's standing to pursue its

19

claims regarding the agency's actions subsequent to plaintiff's elimination.  Plaintiff challenges the agency's inclusion of intervenor-defendant after it was "permitted to substantially revise its Sample Task One proposal," ECF No. 34 at 32, and failed to include all of its required contractor team arrangements with its proposal, see id. at 34-38.[10]

Defendant argues that plaintiff does not have standing to bring its remaining claims because it "cannot establish that there was a substantial chance it would have received a contract award but for the alleged errors."  ECF No. 61 at 8.  Defendant further argues that, because the solicitation provided for multiple awards rather than a set number of awards, any errors in the evaluation of those offerors included in the competitive range and the eventual awardees cannot have prejudiced plaintiff.  See id. at 8-9.

Plaintiff responds that, because its "challenges to the Agency's evaluation of [intervenor-defendant's] proposal occurred while **[plaintiff] was still in the competition and prior to its improper elimination**," plaintiff has standing to challenge intervenor-defendant's inclusion in the competitive range.  ECF No. 63 at 5 (emphasis in original).  Plaintiff argues that if the agency were to conduct a new evaluation of proposals, as plaintiff alleges it should based on its alleged errors, "it is far from clear on the record which of the offerors would subsequently be considered the most highly rated."  ECF No. 63 at 7.

In the court's view, plaintiff's remaining challenges to intervenor-defendant's inclusion in the competitive range constitute challenges to the agency's actions subsequent to plaintiff's elimination from the competition.  As such, plaintiff could not have been prejudiced by the agency's actions and lacks standing to bring the claims.

To succeed on its argument that the VA should have excluded intervenor-defendant, plaintiff must demonstrate that it was prejudiced—meaning, at minimum, show that "had the alleged errors been cured, . . . 'its chances of securing the contract [would have] increased.'"  Precision Asset, 125 Fed. Cl. at 233 (quoting Info. Tech., 316 F.3d at 1319).  The court agrees with defendant that plaintiff has not done so.  In the court's view, the VA's evaluation of intervenor-defendant's proposal, whether inappropriately revised or missing required components, did not affect the VA's evaluation of plaintiff's proposal.  Plaintiff has neither explained how—nor pointed to any record evidence that—a change in the VA's evaluation of intervenor-defendant's proposal would have changed how the VA viewed plaintiff's proposal.  Simply stating that it was "extremely close from a technical and pricing standpoint when compared to offerors included in the competitive range" is insufficient under the multi-award circumstances here.  ECF No. 34 at 45; see also Wis. Physicians, 151 Fed. Cl. at 43

---

[10]     Although plaintiff couches its arguments related to intervenor-defendant in terms of disparate treatment of proposals, the challenges are—at their core—challenges to the agency's inclusion of intervenor-defendant in the competitive range.  See ECF No. 34 at 32-38.

(noting that it would be "illogical" for an agency to "reverse course and reinstate an offeror that had been eliminated from the competition as technically unacceptable" merely because another offeror's proposal was deficient).  As defendant noted, there was no guaranteed number of awards, and the exclusion of one offeror from the competitive range did not necessarily ensure the inclusion of another.  See ECF No. 61 at 68. Therefore, regardless of the VA's evaluation of intervenor-defendant's proposal, plaintiff cannot establish prejudice sufficient to confer standing, and its claim on this point must fail.  See Alfa Laval, 175 F.3d at 1367 (noting that to establish prejudice, "a protester must show 'that there was a substantial chance it would have received the contract award but for that error'") (quoting Statistica, 102 F.3d at 1582).

IV.  Conclusion

Accordingly, for the foregoing reasons:

(1)  Plaintiff's motion for judgment on the AR, ECF No. 34, is **DENIED**;

(2)  Defendant's and intervenor-defendant's cross-motions for judgment on the AR, ECF No. 36 and ECF No. 44, are **GRANTED**;

(3)  The clerk's office is directed to **ENTER** final judgment in defendant's and intervenor-defendant's favor **DISMISSING** plaintiff's complaint with prejudice; and

(4)  On or before **March 21, 2022**, the parties are directed to **CONFER** and **FILE** a **notice** attaching the parties' agreed upon redacted version of this opinion, with all competition-sensitive information blacked out.

IT IS SO ORDERED.

s/Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Judge